NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ELIJAH JOSEPH KAMARA, *Appellant*.

No. 1 CA-CR 18-0856

FILED 5-21-2020

Appeal from the Superior Court in Maricopa County
No. CR2016-148650-001
The Honorable Dean M. Fink, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Andrew S. Reilly
*Counsel for Appellee*

The Poster Law Firm, PLLC, Glendale
By Rick Poster
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge David B. Gass joined.

W I N T H R O P, Judge:

¶1        Elijah Joseph Kamara appeals his convictions and sentences for child abuse and aggravated assault. A jury found Kamara guilty of striking and injuring an eight-month-old family member ("the child") residing in Kamara's home. Kamara argues (1) the trial court erred in permitting the State to introduce at trial recorded excerpts of police interviews conducted without interpreters, (2) trial counsel was ineffective, and (3) insufficient evidence supports the jury's finding that Kamara committed the offenses in the presence of a child. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

¶2        Kamara and his wife lived in a household with an extensive family unit that included several children, a niece, and a family friend ("Hassan"). Most of the family is originally from Sierra Leone, Africa. In May 2015, the niece gave birth to the child, which led to tension between Kamara and the niece, and the household subsequently moved to a larger home. The tension between Kamara and the niece continued to escalate, however, especially after Kamara asked the niece to pay rent and otherwise contribute to the household, and the niece balked at the request.

¶3        On February 6, 2016, while the niece was at work, Hassan brought the child home from daycare. After waking up Kamara's wife's fourteen-year-old daughter ("the daughter"), who often cared for the child while the niece worked, Hassan placed the child in a highchair, which was next to a partial wall on the second floor of the family's home. Hassan left the house, and the daughter played with and cared for the child until

---

[1]        We view the evidence in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Kamara. *See State v. Stroud*, 209 Ariz. 410, 412, ¶ 6 (2005).

Kamara told her to go downstairs, eat, and take some medication. She went downstairs, and Kamara was eventually upstairs alone with the child.

¶4   Shortly after the daughter went downstairs, she heard the child begin crying loudly. The daughter went back upstairs to check on the child. She noticed what appeared to be a significant "bump" on the side of his head. She asked Kamara for help with the child, but instead of helping, Kamara left, saying the child was not his concern. The daughter then called the niece, her mother (Kamara's wife), and Hassan for help. The niece came home from work and took the child to the hospital.

¶5   Because of the nature and severity of the child's injuries, medical personnel immediately transferred him to Phoenix Children's Hospital. The child had a life-threatening complex partial skull fracture to the left side of his head, substantial bleeding under and around the fracture, and "some contusions to the brain tissue itself." He also had a contusion to the right side of his brain, bruising on the right side of his face, and swelling over both sides of his head. The injuries appeared to be the result of extreme force "far in excess of what you would see in a child who has a typical fall," and were consistent with the child being hit with such force to the right side of his head that it caused the left side of his head to smash into a wall.[2] The child remained hospitalized for more than a month and has physical, behavioral, and developmental disabilities as a result of his injuries.

¶6   Glendale police officers interviewed various family members, medical personnel, and other persons who might have knowledge of the events and audio-recorded some of these interviews. In the interviews, the daughter said Kamara had been upstairs alone with the child when the child was injured. Kamara initially told a detective he had not been at the home when the child was injured, but later stated he had been at the home and heard the child crying.

¶7   A grand jury issued an indictment charging Kamara with Count I, child abuse, a class two felony, dangerous crime against children, and domestic violence offense; and Count II, aggravated assault, a class four felony and domestic violence offense. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 13-705, -1203, -1204, -3601, -3623.

---

[2]  At the time of his injuries, the child could not yet walk or get out of the highchair by himself.

**¶8** The jury found Kamara guilty as charged on both counts. As aggravating circumstances, the jury found Count I was a dangerous crime against a child and that, as to both counts, (1) the victim suffered physical, emotional, or financial harm and (2) Kamara had committed the offenses in the presence of a child. The trial court later found Kamara had committed the offenses while on probation for a prior misdemeanor offense of vulnerable adult abuse, to which he had pled guilty. The court sentenced Kamara to an aggravated term of 18.5 years' imprisonment for Count I and four years' probation upon his release from prison for Count II.

**¶9** We have jurisdiction over Kamara's timely appeal. *See* Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A).

**ANALYSIS**

I.    *Introduction of Police Interviews*

**¶10** As previously noted, during their investigation, police officers interviewed and obtained recorded statements from numerous persons. Several of the interviewees appeared as witnesses at trial, and excerpts of their previously recorded interviews were admitted into evidence and played at trial.

**¶11** Kamara argues these recorded excerpts were possibly not relevant and should not have been admitted for several reasons related to reliability: (1) many of those persons interviewed, including Kamara, were "foreigners with wholly different ideas and concepts about communication" who "had minimal English communicative abilities"; (2) interviewing police officers presumably had difficulty communicating with the witnesses during the investigation; and (3) "[t]here was no evidence that any interpreter was used" during the interviews.[3] Imbedded within his argument is an additional argument we also address—that the interpreter provided for Kamara's wife at a pretrial interview and at trial was

---

[3]    Kamara purports to quote the Phoenix Police Department's operations manual for the requirement that qualified interpreters be used when officers are otherwise unable to communicate with hearing/speaking-impaired individuals. We note, however, that the Glendale Police Department investigated this case, not the Phoenix Police Department. Kamara does not argue, and the record does not indicate, that the Glendale Police Department's operations manual, interview process, and procedures are the same as or similar to those of the Phoenix Police Department.

inadequately qualified. Kamara argues his fair trial and due process rights were violated when the trial court permitted the recordings to be introduced at trial.

¶12        Although Kamara argues the trial court violated his constitutional rights to a fair trial and due process, he did not raise any purported constitutional violation regarding these issues to the trial court. Further, Kamara does not dispute the State's contention that he never specifically objected at trial to the apparent lack of interpreters during the interviews.

¶13        We will not disturb a trial court's ruling on the admissibility of evidence absent an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 208, ¶ 60 (2004). When a defendant fails to assert constitutional or other error in the trial court, we review for fundamental error only. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005); *State v. Williams*, 220 Ariz. 331, 334, ¶ 8 (App. 2008) (citing cases).

¶14        As to Kamara's argument the recorded interview excerpts were generally not relevant, we disagree. Evidence that tends to make a fact of consequence more or less probable is relevant, Ariz. R. Evid. 401, and "[a]ll relevant evidence is admissible unless otherwise prohibited by law." *State v. Kiper*, 181 Ariz. 62, 65 (App. 1994) (citing Ariz. R. Evid. 402). Here, the recorded excerpts taken together indicated Kamara was alone upstairs with the child at the time the child was injured, and they properly and clearly demonstrated the inconsistencies in his statements to the police. Thus, the excerpts were relevant because they made it more probable that Kamara caused the child's injuries. *See* Ariz. R. Evid. 401.

¶15        Next, as to Kamara's argument the interpreters were needed throughout the pretrial interviews, we again disagree. We have carefully read the trial transcripts and listened to the recorded interview excerpts admitted at trial. There is no indication the interviewees whose audio recordings were used at trial requested an interpreter, either during their interviews or at trial. Further, the record indicates the interviewees, including Kamara, generally understood and communicated well in English.[4] Their statements were suitably responsive to the questions asked, and they clarified the officers' questions and their responses as appropriate. Moreover, the record provides no indication the police were "unable to

---

[4]        The parties agree English is the official language of Sierra Leone, but Kamara argues most people in that country speak Krio, an English-based Creole language.

communicate" with the interviewees, as Kamara now claims. On this record, we find no error, much less fundamental error, based on a lack of interpreters at the pretrial interviews.[5]

**¶16**        Citing *State v. Natividad*, 111 Ariz. 191 (1974), and *State v. Hansen*, 146 Ariz. 226 (App. 1985), Kamara implies his due process and fair trial rights were violated because he was not afforded a competent interpreter both before and at trial. Kamara's reliance on *Natividad* and *Hansen* is inapposite because the record makes clear that, unlike the defendants in those cases, Kamara was not simply a passive observer who did not understand the proceedings, as he now suggests. *See Natividad*, 111 Ariz. at 194; *Hansen*, 146 Ariz. at 232. The record demonstrates Kamara was engaged throughout the proceedings and understood and communicated well in English. Consequently, the absence of an interpreter for Kamara either before or at trial neither violated his due process rights nor constituted fundamental error.

**¶17**        Kamara also argues the interpreter provided for his wife at a pretrial interview and at trial was unqualified. But the State did not introduce any recorded excerpts from the police interview of Kamara's wife. Additionally, at trial, before Kamara's wife testified, Kamara's counsel brought up the subject of the interpreter's qualifications and said Kamara's wife "might have some difficulty with the translation." The prosecutor then avowed as follows:

> I can tell you, Judge, that we had an interview, I guess it was mainly my interview, but [defense counsel] was there. And using this interpreter back in I think it was February. And we did an interview for over an hour and 15 minutes with this interpreter. The whole time -- Ms. Kamara would speak some English and some in another language. She appeared to understand the questions that were being asked. She answered in a responsive way. And when she would say

---

[5]        Moreover, after reviewing the record, we agree with the State that, in this case, any inconsistencies in testimony caused by witnesses' language issues simply affected the weight of the evidence garnered from their interviews and testimony, rather than its admissibility. *See, e.g., State v. Lehr*, 201 Ariz. 509, 517, ¶ 24 (2002) ("It is a basic maxim that judges determine admissibility of evidence and juries decide what weight to give it.").

things back, we understood what the interpreter was telling us and to be responsive to our questions.

So to the extent the defendant is claiming that this interpreter is inadequate, we seem to have a history that would tend to say otherwise. I guess he's not really making a request not to use the interpreter, but I just wanted to make that record.

Defense counsel did not dispute this avowal, and the trial court later discussed the matter with Kamara's wife before proceeding. Kamara's wife affirmed she knew "some English," and she agreed that if she did not understand the interpreter, she would inform the court. The interpreter at issue was then used throughout the wife's testimony, including cross-examination and redirect examination.

¶18 During her testimony, Kamara's wife testified she understood English well but that speaking it sometimes gave her a "problem," and the trial court later noted she appeared to understand both sides' questions and her answers were responsive.[6] We have read the transcripts of her testimony and agree with the trial court. The record provides no indication that Kamara's rights to due process or a fair trial were violated or that error occurred because of either the admission of the excerpts of the recorded police interviews or the use of the translator at issue.

### II. Ineffective Assistance of Counsel Claim

¶19 Kamara also argues his trial counsel was ineffective. Ineffective assistance of counsel claims are properly raised in Rule 32 post-conviction relief proceedings. *State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9 (2002). "Any such claims improvidently raised in a direct appeal . . . will not be addressed by appellate courts regardless of merit." *Id.* Therefore, we do not address Kamara's ineffective assistance of counsel claim.

### III. Presence of a Child as an Aggravator in Sentencing

¶20 Kamara also maintains "no child present in the home knew of or was aware of the underlying offense" when it happened. Relying on that

---

[6] At one point, the trial court even interrupted Kamara's wife's testimony to ask her to slow down because, although she appeared to understand the prosecutor's questions, the court needed her to "please wait until the interpreter says the question again and then you can give your answer. Okay?"

premise and *State v. Hancock*, 240 Ariz. 393, 399-400, ¶¶ 20-24 (App. 2016), he argues insufficient evidence supported the jury's finding of the "presence of a child" aggravating circumstance and the trial court erred in considering that aggravator at sentencing.

**¶21**       An aggravating circumstance exists when (1) a defendant commits an offense in the presence of a child and (2) the offense satisfies the statutory elements of a domestic violence offense.[7]  *See* A.R.S. § 13-701(D)(18) (citing A.R.S. § 13-3601(A)).   However, "the § 13-701(D)(18) aggravator cannot be sustained where the only evidence presented indicates the child was entirely unaware of the offense."  *Hancock*, 240 Ariz. at 399, ¶ 22 (citations omitted).

**¶22**       Generally, we review *de novo* a question of sufficiency of the evidence.  *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).   Remand is only necessary, however, when it is unclear whether the trial court would have imposed the same sentence absent the inappropriate factor.  *See State v. Johnson*, 229 Ariz. 475, 482, ¶ 20 (App. 2012) (remanding for resentencing because the trial court relied on improper aggravating factors *and* the record did not demonstrate the court would necessarily impose the same sentence absent the improper factors); *State v. Pena*, 209 Ariz. 503, 509, ¶ 24 (App. 2005) ("When it is 'unclear whether the judge would have imposed the same sentences absent the inappropriate factor, the case must be remanded for resentencing.'" (quoting *State v. Alvarez*, 205 Ariz. 110, 116, ¶ 19 (App. 2003))).

**¶23**       Here, even assuming *arguendo* that insufficient evidence supported the jury's finding of the aggravating circumstance at issue, such an error would not require that we remand for resentencing.  As Kamara acknowledges, the jury found three aggravating circumstances for Count I and two for Count II, including that Kamara had committed the offenses in the presence of a child, and the trial court found Kamara had committed the offenses while on probation for a prior misdemeanor offense of vulnerable adult abuse.  At sentencing, the trial court found "any one of the aggravating factors alone is sufficiently substantial to warrant an aggravated sentence."  And Kamara does not contest the trial court's use of the jury's other findings—that the victim suffered physical, emotional, or financial harm, and that Count I was a dangerous crime against a child—or the trial court's finding that Kamara committed the offenses while on probation.  As a result, we can say beyond a reasonable doubt the trial court

---

[7]       Kamara does not contend his offenses failed to satisfy the statutory elements of a domestic violence offense.

would have imposed the same sentence even if it had not considered the "presence of a child" aggravator. Accordingly, any possible error is harmless, and Kamara is not entitled to resentencing. *See Pena*, 209 Ariz. at 509, ¶ 24.

## CONCLUSION

**¶24** Kamara's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA